UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
LEI CHEN,

                                        Plaintiff,                          **Index No.:**

                                                                            **COMPLAINT**
        -against-

CENNTRO ELECTRIC GROUP LTD,                                                 Plaintiff Demands a Trial by
CENNTRO AUTOMOTIVE CORPORATION,                                             Jury
CENNTRO AUTOMOTIVE GROUP,
GREENLAND TECHNOLOGIES HOLDING CORP.
GREENLAND ACQUISITION CORPORATION,
ZUGUANG "PETER" WANG, individually,
RAYMOND WANG, individually,

                                        Defendants.
------------------------------------------------------------------X

        Plaintiff, LEI CHEN, (hereinafter referred to as "Plaintiff" or "CHEN"), by and through

Plaintiff's attorneys, DEREK SMITH LAW GROUP, PLLC, as and for Plaintiff's Complaint in

this action against CENNTRO ELECTRIC GROUP LTD, CENNTRO AUTOMOTIVE

CORPORATION, CENTRO AUTOMOTIVE GROUP, GREENLAND TECHNOLOGIES

HOLDING CORP, GREENLAND ACQUISITION CORPORATION, ZUGUANG "PETER"

WANG, *individually*, and RAYMOND WANG, *individually*, (hereinafter collectively referred to

as "Defendants"), respectfully alleges as follows upon information and belief:


                              **NATURE OF THE CASE**

1. This is an action by Plaintiff to recover damages arising from Defendants' violations of the

   Fair Labor Standards Act, breach of contract with respect to employment and grant of stock

   options, fraud, fraudulent misrepresentation, fraudulent inducement, unjust enrichment,

   promissory estoppel, defamation (slander and libel), unauthorized use of name and likeness,

and whistleblower retaliation under Sarbanes-Oxley Act, 18 U.S.C. §1514A. Plaintiff has filed a complaint of Whistleblower Retaliation with OSHA, and will amend this complaint to include a cause of action under 18 U.S.C. §1514A after the requisite administrative period has lapsed or OSHA has dismissed the complaint.

2. CENNTRO and GTEC operate a blatant scam of massive proportions, one that has siphoned hundreds of millions of dollars of investor capital in an effort to enrich its founder, Peter Wang, and his son, Raymond Wang.

3. For years, CENNTRO and GTEC have lied to investors by committing fraud solely to enrich themselves. They have lied to investors and misled them about their products, employees, intellectual property, the number of factories they have in operation, the development of a SOC chip (which doesn't even exist!), and various other transgressions that will come to light throughout discovery in this matter.

4. This complaint demonstrates how Defendants used and abused Plaintiff's reputation, goodwill, expertise, credentials, and scientific background to enrich themselves while willfully refusing to compensate Plaintiff for his contributions to Defendants' privately and publicly owned enterprises since as early as 2015.

5. Defendants willingly misled Plaintiff and the SEC about Mr. Chen's employment status and position in companies owned and controlled by Defendant Peter Wang, for the benefit of Mr. Peter Wang and his son, Defendant Raymond Wang.

6. Today, Plaintiff does not know <u>who</u> his employer is, <u>what</u> his role is, <u>how</u> he is being compensated, and <u>how</u> much he is being compensated. CENNTRO and GREENLAND are passing Plaintiff around like a hot potato while both simultaneously claiming no responsibility

for his employment, while at the same time marketing his name and likeness, inventions, and work product, as their own in order to fraudulently enrich themselves.

7. To make matters worse, after informing Defendants that they were lying to investors in relation to registered securities, and were filing fraudulent documents with the SEC, Defendants retaliated against Plaintiff by removing him from all company communications, cutting off his email, removing him from the website, and refusing to pay him any of the money he was owed.

8. GREENLAND TECHNOLOGIES LTD, a publicly traded company on the NASDAQ, lists Plaintiff as their "Chief Scientist," on its website[1] and with many public Securities Exchange Commission ("SEC") filings. This agreement is fraudulent, and Plaintiff has absolutely no record of ever signing it. GREENLAND has no record of him signing it either. GREENLAND TECHNOLOGIES also fraudulently represents to investors that Plaintiff is their Chief Scientist. He is not. After inquiring with GREENLAND TECHNOLOGIES before filing this lawsuit, GREENLAND TECHNOLOGIES informed Plaintiff that they did not know how the agreement ended up with the SEC. But they do – they committed fraud by using Plaintiff's name and reputation in order to induce investors to invest in them.

9. In fact, CENNTRO ELECTIC GROUP LTD has never officially terminated Plaintiff. A termination letter does not exist. Plaintiff has never executed any documents with GREENLAND TECHNOLOGIES LTD and was only recently informed by Mr. Peter Wang that GREENLAND TECHNOLOGIES LTD is Plaintiff's employer.

10. Both CENNTRO ELECTRIC GROUP LTD and GREENLAND TECHNOLOGIES LTD are majority owned and controlled by Defendant Peter Wang and his son, Defendant Raymond Wang.

---

[1] https://ir.gtec-tech.com/corporate/management

11. One thing is clear: Mr. Peter Wang used his familial connections with his son Defendant Raymond Wang and his position of power and control over two publicly traded companies to fraudulently benefit from Plaintiff's scientific expertise and credentials while not paying him a dime.

12. Accordingly, Plaintiff brings this lawsuit to obtain his rightful compensation and to shed light on Defendants' fraudulent practices.


## JURISDICTION AND VENUE

13. Jurisdiction of this action is conferred upon this Court as this case involves a dispute between diverse parties with the Plaintiff being a resident of the State of Texas and the Defendants being residents of the State of New Jersey, and because the fraudulent employment agreement that Defendant GTEC uploaded to the SEC website indicates that they accept New York's jurisdiction for all disputes.

14. This Court further has jurisdiction regarding these claims as they involve violations of the Fair Labor Standards Act of 1938, 29 U.S.C. 203.

15. Venue is proper in this court based upon the fact that the Defendants have purposely availed themselves of the jurisdiction and venue in New York by uploading to the SEC a fraudulent employment agreement[2] that agrees to jurisdiction and venue in the State of New York.


## PARTIES

### Plaintiff Lei Chen

16. Plaintiff Lei Chen (hereinafter referred to as "Plaintiff" and/or "Mr. Chen") is a resident of

---

[2] https://www.sec.gov/Archives/edgar/data/1735041/000121390019021522/f8k102419ex10-2_greenland.htm

Travis County, Texas.

17. Plaintiff holds a bachelor's degree and a Ph.D. in Physics.

18. Plaintiff is an expert at propulsion and vehicular technologies.


**Defendant Peter Wang and His Son Defendant Raymond Wang**

19. Defendant Peter Wang is a resident of the State of New Jersey.

20. Defendant Raymond Wang is a resident of the State of New Jersey.

21. Defendant Peter Wang is the Chief Executive Officer and Chairman of the Board for CENN.

22. Defendant Peter Wang is the Chairman of the Board for GTEC.

23. Defendant Peter Wang maintains full power and control of both CENN and GTEC.

24. Defendant Peter Wang's son, Defendant Raymond Wang, is the Chief Executive Officer of GTEC.

25. At all times material, CENN and were either joint employers or a single integrated employer of Plaintiff for the purposes of the FLSA and requisite state law.

26. At all times material, CENNTRO ELECTRIC GROUP LTD, CENNTRO AUTOMOTIVE GROUP, CENNTRO AUTOMOTIVE CORPORATION, GREENLAND TECHNOLOGIES HOLDING CORP, and GREENLAND ACQUISITION CORPORATION acted as one joint employer and entity owned and controlled by Defendants Peter Wang and Raymond Wang.


**CENNTRO and GTEC**

27. Defendant CENNTRO ELECTRIC GROUP LTD (hereinafter "CENN") is a "Revolutionary commercial EV technology company with advanced, market- validated commercial vehicles.

Cenntro leads transformation in the auto industry through scalable, decentralized production and fully digitalized autonomous driving solutions empowered by the Cenntro iChassis."[3]

28. Defendant CENNTRO AUTOMOTIVE GROUP is owned and operated by CENN and Mr. Peter Wang.

29. CENN has its headquarters located at 225 Willow Brook Rd. Unit 14, Freehold, NJ 07728.

30. CENN is a publicly traded company, trading on the NASDAQ with the ticker "CENN".

31. According to the New Jersey Secretary of State, CENN also operates under the name "CENNTRO AUTOMOTIVE CORPORATION."

32. Defendant GREENLAND TECHNOLOGIES HOLDING CORP. (hereinafter "GTEC") is "a leading developer of innovative and quality solutions in the material handling industry. [GTEC] have gained the trust and reputation to become the leading transmission and drivetrain systems provider for material handling equipment in China."[4]

33. Defendant GREENLAND ACQUISITION CORPORATION is owned and operated by GREENLAND TECHNOLOGIES HOLDING CORP., Defendant Peter Wang, and Defendant Raymond Wang.

34. GTEC has its principal headquarters located at 50 Millstone Road, Building 400 Suite 130, East Windsor, NJ, United States 08512.[5]

35. "Established in 2006, Greenland Technologies is a leading transmission and drivetrain systems provider for material handling equipment such as forklift trucks for industrial and logistic applications."[6]

---

[3] https://www.cenntroauto.com/company/
[4] https://ir.gtec-tech.com/
[5] https://ir.gtec-tech.com/resources/investor-faqs#:~:text=WHERE%20IS%20GREENLAND'S%20CORPORATE%20HEADQUARTERS,%2C%20NJ%2C%20United%20States%2008512.
[6] https://ir.gtec-tech.com/

36. GTEC is a publicly traded company, trading on the NASDAQ with the ticker "GTEC."


## STATEMENT OF FACTS

**Plaintiff Instrumental in Developing CENN's Technology**

37. In or around March 2015, CENN hired Plaintiff as an unpaid consultant working in China.

38. Defendant Peter Wang promised Plaintiff that the only way he would be able to pay Plaintiff

    is if Plaintiff delivered a viable product – ie, a working electric vehicle.

39. Mr. Wang promised Plaintiff that he would use the viable product to raise investor capital in

    order to expand operations for CENN, and pay Plaintiff.

40. Plaintiff personally installed the first drivetrain on a CENN vehicle in 2015. CENN did not

    compensate Plaintiff for doing so.

41. As a result of Plaintiff's hard work and ingenuity in developing technologies for CENN,

    Defendant Peter Wang was successful in raising funds from investors in 2016 to fund CENN's

    ongoing operations and expansion.

42. On or around July 22, 2016, Defendant Peter Wang sent Plaintiff a "Memorandum" in which

    he offered Plaintiff employment as the "VP in Technology and Development" and "Director

    of Technology Development Institution" for CENN.

43. The offer letter indicated that Plaintiff would spend at least "60% of his time working in China"

    and the compensation package would include a base salary of "500,000 RMB paid monthly,

    350,000 stock options at $1.50 per share."

44. Plaintiff accepted CENN and Defendant Peter Wang's offer by executing the Memorandum.

45. In or around July 2016, CENN finally began compensating Plaintiff for his work as a part-time

    employee at 50% of his salary.

46. On or around August 2016, CENN started compensating Plaintiff for his work on a full-time basis.

47. Between July of 2016 and October of 2018, CENN encountered financial difficulties.

48. In or around October of 2018, Mr. Peter Wang required CENN executives to delay their expected compensation so as to ensure that the low-level factory workers could be paid. He promised Plaintiff and the other executives that they would eventually be paid back.

49. Despite working thousands of hours for CENN, Mr. Peter Wang, and Mr. Peter Wang's companies, Defendants have refused to compensate Plaintiff a dime for his work since March 2019, thereby violating the FLSA, state laws, and their contracts with Plaintiff. In addition to the payments owed since 2019, CENN also owes Plaintiff damages for paying him late.


**The Stock Option Agreements**

50. On or around August 31, 2021, CENN offered Plaintiff an "Incentive Stock Option Agreement."

51. This agreement stated that Plaintiff would be given the option to purchase 350,000 shares of CENN at the exercise price of $0.4895 per share. CENN back-dated this agreement to 2015.

52. CENN was only using this agreement to incentivize Plaintiff to continue working with them so that they could complete their merger with NAKD brands. Plaintiff relied on CENN and Mr. Peter Wang's offer of stock options when he continued to work for CENN. In fact, in connection with the NAKD merger, Plaintiff travelled and presented to investors around the world. Plaintiff also attended and presented at several ZOOM meetings.

53. In reference to continued employment, the agreement stated:

> "This Option shall expire, and all rights hereunder to purchase the Shares shall terminate eight (8) years from the date hereof. This Option shall earlier terminate

subject to Sections 7 and 8 hereof upon, and as of the date of, the termination of Optionee's employment if such termination occurs prior to the end of such eight (8) year period. Nothing contained herein shall confer upon Optionee the right to the continuation of his or her employment by the Company or to interfere with the right of the Company to terminate such employment or to increase or decrease the compensation of Optionee from the rate in existence at the date hereof.

54.  In reference to termination of employment, the agreement stated:

"If Optionee shall cease to be employed by the Company for any reason, whether voluntarily or involuntarily, other than by his or her death, Optionee (or if the Optionee shall die after such termination, but prior to such exercise date, Optionee's personal representative or the person entitled to succeed to the Option) shall have the right at any time within three (3) months following such termination of employment or the remaining term of this Option, whichever is the lesser, to exercise in whole or in part this Option to the extent, but only to the extent, that this Option was exercisable as of the date of termination of employment and had not previously been exercised; provided, however: (i) if Optionee is permanently disabled (within the meaning of Section 22(e)(3) of the Code) at the time of termination, the foregoing three (3) month period shall be extended to six (6) months; or (ii) if Optionee is terminated "*for cause*", as that term is defined, or by the terms of the Plan or this Option Agreement or by any employment agreement between the Optionee and the Company, this Option shall automatically terminate as to all Shares covered by this Option not exercised prior to termination. Unless earlier terminated, all rights under this Option shall terminate in any event on the expiration date of this Option as defined in Section 4 hereof."

55.  In reference to reorganization, the agreement stated,

"In the event of a proposed dissolution or liquidation of the Company, a merger or consolidation in which the Company is not the surviving entity, or a sale of all or substantially all of the assets or capital stock of the Company (collectively, a "**Reorganization**"), unless otherwise provided by the Board, this Option shall terminate immediately prior to such date as is determined by the Board, which date shall be no later than the consummation of such Reorganization. In such event, if the entity which shall be the surviving entity does not tender to Optionee an offer, for which it has no obligation to do so, to substitute for any unexercised Option a stock option or capital stock of such surviving of such surviving entity, as applicable, which on an equitable basis shall provide the Optionee with substantially the same economic benefit as such unexercised Option, then the Board may grant to such Optionee, in its sole and absolute discretion and without obligation, the right for a period commencing thirty (30) days prior to and ending immediately prior to the date determined by the Board pursuant hereto for termination of the Option or during the remaining term of the Option, whichever is the lesser, to exercise any unexpired Option or Options without regard to the installment provisions of Section 5; provided, however, that such exercise shall be

subject to the consummation of such Reorganization. Subject to any required action by the shareholders of the Company, if the Company shall be the surviving entity in any merger or consolidation, this Option thereafter shall pertain to and apply to the securities to which a holder of Shares equal to the Shares subject to this Option would have been entitled by reason of such merger or consolidation, and the installment provisions of Section 5 shall continue to apply.

## CENN Completes a "Reverse-Merger" with Naked Brands Group (NAKD)

56. On or around December 31, 2021, Naked Brands Group Limited, an Australian company specializing in lingerie manufacturing trading on the Nasdaq with the ticker symbol "NAKD," used its newfound cash holdings to acquire CENN.

57. Plaintiff was present during several investor meetings with NAKD. As a matter of fact, Plaintiff spoke with NAKD's senior executives about the development work that he was doing for CENN.

58. Mechanically speaking, NAKD acquired the outstanding stock of three (3) entities that together encompass CENNTRO AUTOMOTIVE GROUP.

59. In connection with the acquisition, NAKD also updated its ticker symbol and company name to "Cenntro Electric Group Limited."

60. Despite being labelled as an "combination" or a "merger" in all investor relations communications, it was anything but that. In reality, CENN merged with NAKD, and CENN became the surviving entity.

61. Defendant Peter Wang orchestrated this reverse-merger in order to ensure that Plaintiff, and many other employees of CENN (mostly in China), would not receive the option grant he was entitled to receive[7]. In doing so, Defendant Peter Wang defrauded not only Plaintiff, but potentially dozens of other workers in China who were instrumental in building CENN's

---

[7] *See* Chen v. Wang, et al. (3:22-cv-04708) USDC, NJ, filed 7/22/22

technologies.

62. This is evidenced by the fact that Mr. Wang remained the Chief Executive Officer and Chairman of the Board for CENN, prior to, and after the merger.

63. This is also evidenced by the fact that in conjunction with the merger, NAKD immediately its name to "Cenntro Electric Group Limited."

64. This is also evidenced by the fact that NAKD brands' entire mission shifted from lingerie production to electric vehicle manufacturing and development. In addition, the entire executive team for NAKD departed the company.

65. Make no mistake about it, CENN was the surviving and controlling entity in this peculiar merger.

66. This was a reverse-merger, something that Mr. Wang had participated in several times.

67. By way of example only, Mr. Wang completed a reverse merger with the shell company Techedge in 2004, and later changing its name to "China Biopharma Inc."

68. By way of example only, Mr. Wang completed a reverse merger with a shell company called Unsunco in March of 2007.

69. Plaintiff is entitled to be granted options of least 350,000 shares of CENN stock at the strike price of $0.4895 per share.


**CENN Says Plaintiff Not Employed, Employed by GTEC, GTEC Has No Record of Plaintiff**

70. On or around January 5, 2022, Plaintiff contacted CENN to obtain information about his option grant after the reverse-merger with NAKD that had just occurred on December 30, 2021. Plaintiff requested information on how to effectuate exercising the options that he was granted pursuant to his employment. Plaintiff intended to exercise those options.

71. Shockingly, CENN's management told Plaintiff, "**Your options did not transfer during the merger because you are not on our payroll since March 2019. You are an employee of GTEC now.**"

72. CENN never sent Plaintiff a termination letter. In fact, they confirmed that they have no record of ever terminating him.

73. Plaintiff was completely shocked and utterly confused at this response. CENN never terminated Plaintiff. How would CENN even know he was employed by GTEC now?

74. Shockingly, GTEC had never onboarded Plaintiff, had not provided Plaintiff with employment documents, and had not had any substantive communications with Plaintiff. Plaintiff's sole involvement with GTEC was some tasks that Mr. Peter Wang asked him to complete, for which Mr. Wang promised Plaintiff 20,000 shares of GTEC as compensation.

75. On or around February 8, 2022, in a quest to figure to reach the truth, Plaintiff sent a text message to the Chief Financial Officer for GTEC, Mr. Jing Jin[8], to inquire about his unknown employment status with GTEC.

76. Plaintiff was unaware that he had an employment relationship with GTEC.

77. Mr. Jin responded to Plaintiff, "**We have no record of you working here. There is no employment contract.**"

78. GTEC lists Plaintiff, "Lei Chen," as the "Chief Scientist" on their company's Management page[9] even though GTEC has admitted in writing that it has no record of ever employing Plaintiff. In July of 2022, after Plaintiff informed GTEC that he was not employed by them and that the agreement was fraudulent, GTEC scrubbed the website clean of Plaintiff's name and image. Even still, GTEC could not scrub everything.

---

[8] https://www.linkedin.com/in/jing-jin-0bb241120/?trk=pub-pbmap&originalSubdomain=cn
[9] https://ir.gtec-tech.com/corporate/management

79. GTEC also uploaded a fraudulent "Employment Agreement" between Plaintiff and GTEC to the SEC website [10] in conjunction with a Form 8-K filing. How could this employment agreement exist when their CFO confirmed that it did not? It is absolutely clear this document was a fraud and forgery, created for the sole purpose of misleading investors.

80. Plaintiff has no record of ever receiving, let alone executing, this purported fraudulent Employment Agreement between himself and GTEC.

81. GTEC also told the SEC on several occasions that Plaintiff was their Chief Scientist. He is not, and never was.

82. The agreement appears to indicate that Plaintiff would be compensated at a rate of $45,000.00 per year. Plaintiff has never received a single payment from GTEC.

83. The fraudulent Employment Agreement between Plaintiff and GTEC indicates that Plaintiff would receive a bonus. Plaintiff never received a bonus.

84. The fraudulent Employment Agreement between Plaintiff and GTEC indicates that Plaintiff would be entitled to equity incentives. Plaintiff never received any equity incentives nor information with regards to equity incentives. Defendant Peter Wang even offered Plaintiff at least 20,000 shares as compensation for Plaintiff to work on GTEC. Defendants never paid Plaintiff.

85. The fraudulent Employment Agreement between Plaintiff and GTEC indicates that Plaintiff would be entitled to company benefits including life insurance, retirement, health insurance, and travel pay. Plaintiff never received any benefits nor information regarding these benefits from GTEC.

86. The agreement proports to be executed by GTEC's then-Chief Executive Officer, Mr.

---

[10] https://www.sec.gov/Archives/edgar/data/1735041/000121390019021522/f8k102419ex10-2_greenland.htm

Yanming Liu.

87. On or around October 24, 2019, Greenland Acquisition Corporation, trading on the NASDAQ with ticker symbol "GLAC," merged with Hong Kong based Zhongchai Holding. As part of the merger, GLAC changed its name from "GLAC" to "GTEC" and "GTECW" for its warrants.

88. Curiously, the fraudulent Employment Agreement also proports to have been executed on October 24, 2019, on the same day this acquisition occurred. GTEC executives Peter Wang did this in order to fraudulently increase GTEC's market value by using Plaintiff's name and reputation as a scientist. This agreement was never signed by Plaintiff and Plaintiff does not know how or why GTEC would place his signature on this document without his authorization.

**CENN Continues to Employ Plaintiff**

89. During the merger of CENN and NAKD, Plaintiff was tasked with several functions including speaking to investors and discussing CENN's technology.

90. In or around January 2022, Mr. Wang promised Plaintiff that he would receive a new stock option plan for 350,000 shares of stock options. Then again in February, Mr. Wang re-iterated his offer.

91. On July 5, 2022, Plaintiff still maintained an active CENN email account and was included in the CENN WeChat group. He spoke to Mr. Wang frequently.

92. On or around July 5, 2022, CENN Human Resources contacted Plaintiff and asked him to make updates to his email archive for SEC purposes.

93. Clearly, CENN still employed Plaintiff, evidenced by the fact that they frequently contact him with inquiries in relation to technology and science. As recently as July 12, 2022, CENN was

asking Plaintiff to complete certain tasks.

94. CENN, Mr. Peter Wang, and his son Defendant Mr. Raymond Wang conspired to take advantage of Plaintiff's knowledge in propulsion technology in order to raise hundreds of millions of dollars.

95. Once Defendants had raised money from unwitting investors, Mr. Peter Wang and Mr. Raymond Wang acted in concert to pass Plaintiff from one company controlled by Mr. Peter Wang to another company controlled by Mr. Peter Wang and his son, Defendant Raymond Wang, without Plaintiff's knowledge. Of course, Defendants did this only to enrich themselves by using Plaintiff's reputation, scientific knowledge, and likeness as marketing material.

96. Corporate Defendants did not have, and still do not have, a stock vesting or exercise procedure established.

97. Between March of 2019 and February of 2022, Plaintiff performed thousands of hours of work for CENN.

98. Plaintiff travelled over half a million (500,000) miles at the direction of CENN, but was only compensated up until March of 2019.

99. Plaintiff invented approximately half of the 238 patents currently in the CENN portfolio. Plaintiff built critical alliances with key players, created new quality control concepts, and structured R&D. Plaintiff was present in many investor meetings. Still, Defendants refused to acknowledge Plaintiff's employment and the compensation to which he is entitled.


**YIWEI Shares**

100. In or around 2016, CENN formed a subsidiary named "Yiwei Technology" (hereinafter "YIWEI")

101. YIWEI was developing technologies that CENN could show to investors in order to raise capital. These included the ECU chip, SOC (system on chip), and autonomous driving and an onboard diagnostics and early warning system.

102. Plaintiff was the beneficial and documented owner of 15% of YIWEI stock. CENN did this because it was applying for a government grant that required a key technology holder to hold at least fifteen percent (15%) of the stock in the company.

103. In 2021, CENN merged YIWEI into CENN and dissolved YIWEI.

104. In exchange for Plaintiff's shares, Mr. Peter Wang promised to pay Plaintiff 750,000 RMB (approximately $120,000 USD) for his shares.

105. CENN and Mr. Peter Wang failed to pay Plaintiff for any of the shares of YIWEI that Plaintiff owned.

106. In fact, Mr. Peter Wang and CENN used the technologies developed by YIWEI to induce NAKD to merge. By failing to compensate Plaintiff for the shares in YIWEI, Mr. Peter Wang and CENN profited from the increased value of the technology in the intellectual property portfolio held by YIWEI. Plaintiff received nothing.

### AS A FIRST CAUSE OF ACTION
### UNDER THE FAIR LABOR STANDARD ACT
### MINIMUM WAGE
(AGAINST ALL CORPORATE DEFENDANTS)

107. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

108. Defendants willfully employed Plaintiff in the aforementioned enterprise and permitted him to work, and used his name, likeness, and reputation in the scientific community to market to investors and raise money.

109. Defendants failed to pay minimum wages to Plaintiff as required by the FLSA, 29 U.S.C. §201 et seq. and its implementing regulations.

110. Defendants' failure to pay Plaintiff overtime pay in accordance with the FLSA, was a direct violation of the FLSA, specifically 29 U.S.C. §207.

111. Defendants' failure to pay minimum wages for each hour worked week was willful within the meaning of 29 U.S.C. §255.

112. Defendants' failure to comply with the FLSA caused Plaintiff to suffer loss of wages.

113. Defendants violated the above and Plaintiff suffered numerous damages as a result.

## AS A SECOND CAUSE OF ACTION
## UNDER THE FAIR LABOR STANDARD ACT
## OVERTIME WAGE
(AGAINST ALL CORPORATE DEFENDANTS)

114. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

115. Defendants willfully employed Plaintiff in the aforementioned enterprise for work weeks longer than 40 hours and failed to compensate Plaintiff for Plaintiff's employment in excess of 40 hours per week at a rate of at least one and one-half times the rate at which Plaintiff was employed.

116. Defendants failed to pay overtime wages to Plaintiff as required by the FLSA, 29 U.S.C. §201 et seq. and its implementing regulations.

117. Defendants' failure to pay Plaintiff overtime pay in accordance with the FLSA, was a direct violation of the FLSA, specifically 29 U.S.C. §207.

118. Defendants' failure to pay proper overtime wages for each hour worked over 40 per week was willful within the meaning of 29 U.S.C. §255.

119. Defendants' failure to comply with the FLSA caused Plaintiff to suffer loss of wages.

120. Defendants violated the above and Plaintiff suffered numerous damages as a result.

### AS A THIRD CAUSE OF ACTION
### BREACH OF CONTRACT
(AGAINST ALL DEFENDANTS)

121. All above paragraphs are repeated herein as if set forth fully at length.

122. Defendants promised Plaintiff compensation for working as the Chief Scientist.

123. Defendants promised Plaintiff a grant of stock options in CENN upon an initial public offering.

124. Defendants promised Plaintiff compensation for his 15% ownership stake in YIWEI.

125. Defendants promised Plaintiff a bonus, stock options, stock grants, and benefits.

126. Plaintiff relied on Defendant's promises and continued to work for Defendants, providing valuable services and information that allowed Defendants to raise hundreds of millions of dollars from investors around the world.

127. Defendants have failed to complete or fully perform their obligations.

128. By reason of the foregoing, Defendants breached the subject contracts with Plaintiff.

129. Defendants also breached the covenant of good faith and fair dealing when they acted to terminate Plaintiff as an employee of CENN (without his knowledge) in an effort to eliminate the share options he was to be granted.

130. At the time of the merger between NAKD and CENN, Plaintiff's options would have been worth approximately one million, eight hundred thousand dollars ($1,800,000).

131. By reason of the foregoing, Plaintiff has been damaged an amount to be determined at trial.

## AS A FOURTH CAUSE OF ACTION
### FRAUD
(AGAINST ALL DEFENDANTS)

132. Plaintiff repeats, reiterates and re-alleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length

133. Defendants acted to recruit Plaintiff through false representations as to facts about work conditions, payment, and reimbursement. Defendants made these representations for the purpose of inducing Plaintiff into coming to work for them.

134. At the time of his recruitment, Plaintiff was promised monetary compensation, employment, benefits, and equity.

135. Defendants made many such promises to Plaintiff knowing them to be false, with the intent to induce Plaintiff to perform work and ultimately to exploit Plaintiff's goodwill and expertise in propulsion technology to raise money.

136. Defendants also made many such promises to Plaintiff in order to induce Plaintiff into remaining in their employ.

137. Plaintiff reasonably did rely on the false representations made by Defendants. This reliance occurred in ignorance of the falsity of Defendants' representations.

138. Plaintiff was injured because of his reliance on the false representations made by Defendants.

139. As a direct result of Defendants' actions and inactions, Plaintiff has been damaged in an amount to be determined at the time of trial.


## AS A FIFTH CAUSE OF ACTION
### UNJUST ENRICHMENT
(AGAINST ALL DEFENDANTS)

140. Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

141.   Plaintiff has performed work for Defendants over several years but has never been compensated for his work.

142.   Defendants used Plaintiff's name and likeness as well as his inventions to enrich themselves without paying him.

143.   As a result of the above, Defendants has received an enrichment.

144.   As a result of the above, Plaintiff has suffered an impoverishment.

145.   There exists a connection between the enrichment and the impoverishment.

146.   There is an absence of a justification for the enrichment and impoverishment.

147.   Plaintiff pleads in the alternative, that in the event there is no other remedy under law, Plaintiff is entitled to recovery under the doctrine of unjust enrichment.

## AS A SIXTH CAUSE OF ACTION
## PROMISSORY ESTOPPEL
(AGAINST ALL DEFENDANTS)

148.   Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

149.   Plaintiff relied on the Defendants' above promises to the Plaintiff's detriment.

150.   Defendants continuously assured Plaintiff that they had an agreement and that Plaintiff would be paid monies he was contractually entitled to.

151.   Defendants acted in bad faith in by continuing to promise Plaintiff that he would be re-paid the money that he loaned to Defendants but failed to pay him.

152.   Defendants are in breach of the above agreements.

153.   As a result of the above, Plaintiff has been damaged in an amount to be determined at trial in excess of the jurisdictional limits of all lower courts.

## AS A SEVENTH CAUSE OF ACTION
## FRAUDULENT MISREPRESENTATION
### (AGAINST ALL DEFENDANTS)

154.   Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

155.   Defendants have been sued for failure to pay on contracts before, and this evidences a pattern and practice of fraudulent behavior. By way of example only, GTEC has marketed several individuals' as employees of the company without their knowledge or authorization.

156.   Defendants made a representation to Plaintiff that if Plaintiff continued to work and provide services, he would be compensated with cash, equity, and stock options.

157.   Defendants made the representation knowing that it was false and knowing that they could not honor their promise to Plaintiff.

158.   Defendants made the representation recklessly without knowledge of its truth because they knew that their contracts were fraudulent Plaintiff.

159.   Defendants made this representation knowing that Plaintiff would rely on it in entering into any agreement.

160.   Plaintiff did, in fact, rely on the misrepresentation by Defendants and chose to perform work and enter into agreements with Defendants based on this misrepresentation.

161.   Plaintiff suffered damages because of relying on the misrepresentation because he was not paid the amounts contractually owed to him.


## AS AN EIGHTH CAUSE OF ACTION
## DEFAMATION (LIBEL)
### (Against Defendants GTEC, Peter Wang, Raymond Wang)

162.   Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

163. Defendants did in fact publish false statements about Plaintiff indicating that he was working for them and that he was their Chief Scientist.

164. The statements that Defendants published about or relating to Plaintiff were about the Plaintiff.

165. The statements published did in fact harm the reputation of Plaintiff because he will forever be associated with a company that committed fraud by marketing him as their Chief Scientist.

166. The defendants published the statements in a negligent manner because they knew or should have known that the statements that he was publishing were untrue.

167. Defendants cannot articulate any privilege that would have permitted him to make these untrue statements.

168. Plaintiff suffered damages as a result thereof.

## AS A NINTH CAUSE OF ACTION
## DEFAMATION (SLANDER)
(Against Defendants GTEC, Peter Wang, Raymond Wang)

169. Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

170. Defendants did in fact speak false statements about Plaintiff by stating that he was the GTEC Chief Scientist.

171. The statements that Defendants published about or relating to Plaintiff were about the Plaintiff.

172. Defendants published the statements in a negligent manner because they knew or should have known that the statements that he was publishing were untrue.

173. Defendants cannot articulate any privilege that would have permitted them to make these untrue statements.

174. Plaintiff has suffered damages as a result thereof.

## AS A TENTH CAUSE OF ACTION
### VIOLATION OF NEW YORK CIVIL RIGHTS §50 AND §51
(AGAINST DEFENDANTS GTEC, PETER WANG, RAYMOND WANG)

175. Plaintiff re-alleges and incorporates by reference all allegations in all preceding paragraphs.

176. New York Civil Rights Law §50, entitled "Right of privacy," states: "A person, firm or corporation that uses for advertising purposes, or for the purposes of trade, the name, portrait or picture of any living person without having first obtained the written consent of such person, or if a minor of his or her parent or guardian, is guilty of a misdemeanor."

177. New York Civil Rights Law §51, entitled "Action for injunction and damages," states in part: "Any person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait, picture or voice, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait, picture or voice in such manner as is forbidden or declared to be unlawful by section fifty of this article, the jury, in its discretion, may award exemplary damages."

178. Plaintiff pleads, and it is in fact true, that Defendant have been and are engaged in the use of Plaintiff's name and likeness on their Investor Relations website where they claim that Plaintiff is a "Chief Scientist." After Plaintiff notified Defendants that he has not been paid and that they were committing fraud by marketing him as a chief scientist, Defendants removed Plaintiff from all communications and all website, effectively terminating his employment.

179. Defendants openly advertise Plaintiff on their website and uses this advertisement to attract potential investors and buyers of GTEC's products.

180. Defendants are aware that Plaintiff did not authorize the use of his likeness.

181. Accordingly, Plaintiffs demand exemplary damages from Defendants for the violations of their privacy rights.

182. Plaintiffs also demand Defendants immediately remove the offending images from their website and all records.

183. Plaintiff demands that Defendants write a letter to the SEC outlining the fraud that they committed in advertising his name and likeness on their website despite having no connection with the company.

184. Defendants, jointly and severally, owe to Plaintiff, at minimum:

    a. **Salary Wages and Minimum Wages**. Wages, salary, overtime, and appropriate compensation for all hours worked since March of 2019.

    b. **Benefits Compensation.** Defendants never provided Plaintiff with the promised benefits and never contributed to his retirement accounts.

    c. **Options**. An Option Grant equivalent to at least 350,000 options of CENN at a strike price of a maximum of $0.4895 per share, to be determined during discovery in this matter.

    d. **Shares**. A share grant or a payment equivalent to Plaintiff's 15% ownership of YIWEI, and any other company Plaintiff had beneficial interest in in connection with his ownership of YIWEI and CENN.

    e. **Reliance Damages.** Plaintiff relied on Defendant's promises to compensate him with wages and equity in a reasonable timeframe. Defendants failed to provide Plaintiff with his options and wages at a reasonable time and thus Plaintiff did not have an opportunity to take advantage of exercising his options and profiting from

the subsequent sale of the stock.

f.  **Fraud and Likeness.** Damages related to Defendants' use of Plaintiff's name, image, and likeness.

g.  **Defamation.** Defamation damages because Defendants published false statements to third parties about Plaintiff that are verifiably not true.

h.  **Emotional Distress.** Plaintiff has suffered emotional distress and damage to his mental health from the fraud and whistleblowing retaliation he has suffered.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in an amount which exceeds the jurisdiction of all lower courts for all damages including but not limited to compensatory damages, punitive damages, statutory damages, lost wages, back pay, front pay, attorney's fees, costs, interest, and all other damages as are just and proper to remedy Defendants' unlawful and fraudulent employment practices.

Date:   New York, New York
        September 12, 2022

Respectfully Submitted,
**DEREK SMITH LAW GROUP, PLLC.**
*Attorneys for Plaintiff*

BY:  _____
        Danilo Bandovic, Esq.
        1 Pennsylvania Plaza, Suite 4905
        New York, New York 10119
        (212) 587-0760